Tucker, P.
I shall not enter at large into the consideration of the questions which were very ably argued at the bar, because there seems to me to be a fatal defect at the foundation of the plaintiff’s case. Admit that the contract is fully proved as stated, — admit that the statute of frauds, or the rules as to the introduction of parol evidence, offer no barrier to his success, — admit even "that .the contract for the support of Brawley and his daughters had been reduced to writing, and executed with all the solemnities of a sealed instrument, — still I think the plaintiff would have no title to the relief which he seeks. He asks to charge the land with this contract, upon the principle of the vendor’s lien, or to rescind the contract altogether. Let us see, then, whether the vendor Brawley has a right to enforce his claim for the support of himself and daughters, by a resort to the land conveyed to Catron.
*527 The lien of the vendor upon real estate sold by him is a.n equitable Hen, which is of a comparatively modern date, but has been pushed, nevertheless, as it has been supposed, beyond its legitimate extent. Its chiefs have not escaped the vigilance of the courts. In the case of Moore et al. v. Holcombe et al. 3 Leigh 601. our ever to be lamented associate and brother Carr quoted some forcible remarks of the late chief justice, to shew the mischiefs which would flow from extending this equity beyond its just limits. It is, says he, “a secret invisible trust, known only to the vendor and vendee, and those to whom it; may be communicated in fact. To the world the vendee appears to hold the estate divested of any trust whatever; and credit is given to him in the confidence that the property is his own in equity as well as at law. A vendor relying upon his Hen ought to reduce it to a mortgage, so as to give notice of it to the world. If he does not, he is in some degree accessary to the fraud committed on the public, by an act which exhibits the. vendee as the complete owner of an estate on which he claims a secret lien.” Again: “ The lien of the vendor, if in the nature of a trust, is a secret trust; and although to be preferred to any other subsequent equal equity, unconnected with a legal advantage, or equitable advantage which gives a superiour claim to the legal estate, will be postponed to a subsequent equal equity connected with such advantage.” Those remarks (says judge Carr) are very sound, and beyond the limits here established I am unwilling to extend the equitable lien. Judge Cabell also, in the same case, strongly remarks on this secret and invisible lien, and obviously inclines to avoid extending the doctrine beyond its present limits. In these opinions I fully concurred, although I. placed the case on other grounds ; and I now beg leave to say, that unless restricted at least within its present limits, no doctrine would be more pregnant with mis *528 chief. The laws have wisely required conveyances and incumbrances to be placed upon record, to which purchasers may resort for their security and protection. It would be well if vendors who look for their security to the land, would, by express recorded liens, put others on their guard and protect themselves from injury. If this were done, innumerable perjuries would be prevented ; and while the seller would be saved from loss, the buyer would be protected from imposition. Whereas, by the recognition of this doctrine of equitable lien, it is much to be feared that in desperate cases a claim to charge the real subject is often sustained by the vilest subornation and resisted by the most reckless perjury. While, therefore, we shall follow the track of our predecessors on this subject, until the legislature shall otherwise provide, I cordially agree that we should not extend the doctrine one jot beyond its present limits.
The question, then, suggested by the present case is, whether the doctrine of the vendor’s equitable lien ever has been extended so far as to make it a security for independent covenants, sounding in damages, and extending through the indefinite period of a life or lives in being, or even for generations afterwards. This is in effect the question here j for it would be impossible to discriminate from this provision, one which should provide for the maintenance and support of the grandchildren or more remote descendants of the vendor. Suppose the contract then reduced to the forms of a covenant. If broken, no specific sum is due, but the amount of damages must be assessed by a jury. Can it enter into the conception of any judicial mind, that these indefinite damages, — depending on matter in pais, both as to the fact of a breach of the covenant and the extent of the wrong done, — can constitute a fair subject of lien upon land sold ? Whether, in case of a sale, the duty of fulfilling the covenant is to be performed by the purchaser, or he is to be merely respon *529 sible for Catron’s failure to perform, the obligation is one with the incumbrance of which no person would be willing to purchase, and until the deaths of Brawley and his daughters, Catron would therefore be deprived of that most valuable incident of dominion over his property, which consists in the power of disposition. For this onerous contract is to continue during the life of Brawley, though he may live to an advanced age, and during the celibacy of his daughters, who may never marry. Such an incumbrance would render the land unalienable, and thus frustrate that wise policy of our law which has removed, as far as possible, all trammels from alienation. For who would buy this estate from Catron, clogged with the support of a decrepit old man and two maiden daughters, alien to their family and concerns, and intruded into their household, “ with the privilege of a room to themselves, and the free privilege of the smoke house, the meal tub and the stable,” as the witness has expressed it? Or who would buy an estate which is bound for three lives for the faithful performance, by the vendor, of such a contract as this ? Such a lien would be an interdict upon a sale, and cannot be supposed to have been contemplated by the parties ; and this, it is said, is the test of its existence. 1 Mason 212. 4 Wheat. 292. cited by judge Carr in 3 Leigh 600.
There are a few cases in the english books, which are much less strong than this, where the courts have declared the lien to have no existence. In Winter v. Lord Anson, 1 Simons & Stuart 434. 1 Cond. Eng. Ch. Rep. 221. the contract of sale provided for the security of the purchase money, by a bond to remain at interest during the vendor's life. The vice chancellor at first decided that there was a lien, but afterwards set aside that order, and held the lien not to exist. The chancellor reversed the latter decision (3 Russell 488.) and there was an appeal, which was withdrawn. 2 Sugden *530 on Vendors 58. This case, though decided in favour of the lien, on the ground “ that., what was called an annuity was in fact nothing more than the interest of so much of the purchase money as remained unpaid,” was much doubted; and yet how much stronger against the lien is the case at bar. There the amount of the lien was a sum certain: here it is uncertain and fluctuating, depending on the performance of the contract. There it might be removed by paying off the purchase money: here nothing but three deaths can remove it. There money was to be paid: here three pensioners are to be fixed for life upon the purchaser. Indeed it might perhaps perplex a casuist to say whether this unpleasant burden would fall upon the purchaser himself, or whether he would only be responsible to pay in default of Catron's faithful discharge of his contract. Either way, it would impose unreasonably on the purchaser.
The next case I shall mention is Clarke v. Royle, 3 Simons 499. There the estate was conveyed in consideration of the purchaser’s covenant to pay an annuity to the seller for life, and ¿£3000. in, case he married, to such persons as he should think fit. Here, though the annuity was certain, it was decided that the seller had no lien for it, or for the ¿£3000. which was contingent.
In this case, too, the vice chancellor considered the case of Tardiff v. Scrughan, 1 Bro. C. C. 423. as overruled by lord Eldon in Mackreth v. Symmons, 15 Ves. 352. as it certainly was. That case, which was cited in Blackburn v. Gregson, 1 Bro. C. C. 423. was thus. Hewitson and wife conveyed an estate to their two daughters, for an annuity of ¿£20. per annum, and payment of Hewitson's debts. The daughters gave their bond in the penalty of ¿£500. for payment of the annuity. The annuity was for some years regularly paid; but one of the daughters dying, her husband refused to pay more. Lord Camden held that there was a lien for *531 the annuity; but lord Eldon disapproved the decision. That of lord Camden was at an early day (in 1769); that of lord Eldon, when the doctrine had become well settled by repeated adjudications. Now this case was less strong against the lien than ours, since it was a certain fixed money charge, instead of being-either a fluctuating and uncertain demand, or a disagreeable and intolerable burden.
Upon the whole, then, without considering any other point, I am of opinion to affirm the decree.
The other judges concurred. Decree affirmed.